FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNDER SEAL, | CIVIL ACTION NO. 1:20-CV-156-AJT TCB |
| Plaintiff, | |
| v. | COMPLAINT |
| UNDER SEAL, | Filed **UNDER SEAL** pursuant to the False Claims Act, 31 U.S.C. § 3730(b) |
| Defendants. | |

**UNDER SEAL**

**Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES *ex rel.* CHERAYE CRAIG,<br><br>Plaintiff,<br><br>v.<br><br>NORTHROP GRUMMAN CORPORATION and NORTHROP GRUMMAN SYSTEMS CORPORATION,<br><br>Defendants. | CIVIL ACTION NO. 1:20-cv-156-AJT-TCB<br><br>**COMPLAINT**<br><br>FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ.* |

I. **INTRODUCTION**

1.  This is an action brought by *qui tam* Plaintiff and Relator Cheraye Craig on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the FCA" or "the Act"). This action arises from false claims for payment and false statements made by Northrop Grumman Corporation in connection with AAQ-24 Large Aircraft Infrared Countermeasures (LAIRCM) Sustainment Repair contracts.

2.  Northrop caused the Government to overpay under these contracts by failing to disclose or otherwise properly account for inventory acquired using government funds; unilaterally deciding to repair failed assets at a lower rate than it assumed in developing its cost proposals; and misrepresenting costs it anticipated incurring over the course of the contracts. As a result, it is currently booking an astonishing 56% profit rate in a sole-source, fixed-price contract designed to deliver a 14% profit – all at the expense of the armed services and the taxpayers.

II. **JURISDICTION, VENUE AND STATUTORY REQUIREMENTS**

3.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on

this Court for actions brought pursuant to the FCA, 31 U.S.C. §§ 3729 and 3730. The Court has subject matter jurisdiction under 28 U.S.C. § 3730(b).

4. There has been no public disclosure within the meaning of § 3730(e)(4)(A) of the allegations Relator is asserting, and Relator is an original source under § 3730(e)(4)(B). Relator has direct and independent knowledge of the allegations contained herein, and voluntarily provided the information required by 31 U.S.C. § 3730 to the Government before filing this action.

5. This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C § 1391(b) and 31 U.S.C § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in, transact, or have transacted business in this District.

6. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants reside in this District, and further can be found in and transact or have transacted business in this District.

### III. THE PARTIES

7. Relator Cheraye Craig worked for Defendant Northrop Grumman Corporation from 2000 to November 2019, and served as Director of Business Management during the relevant time period. In this role, she performed monthly financial reviews and analysis of all programs within her portfolio, which from 2017 forward, included the AAQ-24 program at issue here. Relator therefore has personal knowledge of the facts alleged, acquired through direct participation in the program and access to internal documentation regarding the program in the ordinary course of her employment.

8. Relator is not aware of any "public disclosure" in connection with the false claims alleged in this Complaint, as defined in 31 U.S.C. § 3730(e)(4)(A). Further, Relator is an "original source" of the information alleged herein on the grounds that she has knowledge which is both direct and independent of any public disclosures to the extent any may exist.

-4-

9. Defendant Northrop Grumman Corporation ("NGC") is a Delaware corporation with its principal place of business in Falls Church, Virginia. It is a global aerospace, defense, and security company. The majority of its business is with the U.S. government, principally the Department of Defense and intelligence community.

10. Defendant Northrop Grumman Systems Corporation ("NGSC") is a Delaware corporation with its principal place of business in Falls Church, Virginia, and is a wholly owned subsidiary of Defendant Northrop Grumman Corporation. NGSC is listed as the signatory on the relevant contracts described below.

11. Collectively, Defendants are referred to in this Complaint as "Northrop."

## IV. FACTUAL ALLEGATIONS

12. Northrop designed and manufactures AAQ-24 Large Aircraft Infrared Countermeasures, which are installed on military jets and designed to defeat infrared guided enemy missiles. It consists of a missile warning system, an integration unit, a processor, and laser turrets.

13. The Federal Government, through the United States Air Force as the contracting agency, contracts with Northrop to repair AAQ-24 assets. Broadly speaking, USAF delivers unserviceable AAQ-24 assets to Northrop, which diagnoses, repairs, and returns the assets to USAF. At issue in this case, and as described further below, are a 2012 Contract and a 2017 Contract for these repairs, as well as a 2016 Cost Proposal that formed the basis of the 2017 Contract price.

14. Because Northrop is the only manufacturer of AAQ-24, and is thus uniquely suited to diagnose and repair the equipment, contracts between the Government and Northrop are sole source, fixed price contracts. Since there is no competition to ensure reasonableness of the contract price, Northrop is required to disclose its proposed costs, and the basis for arriving at those costs, to Government contract negotiators. The Government then relies on these disclosures to negotiate a contract price.

15. The Truth in Negotiations Act (TINA), 10 U.S.C. § 2306a (1994), and the Federal Acquisition Regulation ("FAR"), 48 C.F.R., require that, on all negotiated contracts over a certain threshold dollar amount (including the contracts at issue here), prospective contractors must provide and certify that cost or pricing data submitted to government contract negotiators is "accurate, complete, and current." 10 U.S.C. § 2306a(a)(2). TINA provides for a reduction of the contract price if, after award of the contract, it is found that the contractor's cost or pricing data was not accurate, complete, and current at the time of the contract negotiation. *Id.* at § (a)(1).

16. "Cost or pricing data" is defined by the statute as "all facts that, as of the date of agreement on the price of a contract… a prudent buyer or seller would reasonably expect to affect price negotiations significantly," including "factual information from which a judgment was derived." *Id.* at § (h)(1).

17. For all contracts at issue here, Northrop was required to fully disclose to Government contract negotiators its cost or pricing data and to certify that the information provided was current, accurate and complete.

18. In 2012, the Air Force entered into contract number FA8539-12-D-0003 for the repair of AAQ-24 assets. This 2012 Contract had a 5-year period of performance spanning July 2012 to July 2017, with an initial contract value of $463 million. Payment under the contract included substantial Program Management Support payments amounting to approximately $20 million per contract year (or $100 million throughout the course of the contract), plus payments to Northrop upon its completion of a repair and delivery back to USAF.

19. In order to help Northrop's meet contract deadlines, the Government supplied Northrop with an initial batch of "piece parts" – a catch-all term for the various parts used to repair a malfunctioning AAQ-24 or any of its subcomponents. In addition, the Government supplied Northrop with testing equipment.

20. The 2012 Contract incorporated by reference (a) financing provisions in the FAR (*E.g.*, 48 C.F.R. §§ 52.216-7, 52.232-16, 252.232-7003, and 52.242-4), and (b) the so-called "government property" regulations (48 C.F.R. Part 45 and 48 C.F.R. § 52.245-1).

21. Over the course of the performance of the 2012 Contract, and using the funds from that Contract, Northrop purchased a substantial excess of piece parts. Under the contract and incorporated regulations, these excess piece parts belonged to the Government, and Northrop was required to account for the inventory in the Government's favor. *See* 48 C.F.R. § 52.245-1(e), (j), (k); 48 C.F.R. §§ 45.402, 45.600 *et seq*. Part of Northrop's rationale for accumulating excess inventory was that it would position Northrop well for the next sustainment and repair contract that would inevitably follow. Notably, despite spending Government funds to accumulate substantial excess inventory, Northrop enjoyed a healthy 23% profit margin on the 2012 Contract.

22. In 2016, the Government issued a Request for Proposal for an AAQ-24 sustainment and repair contract to commence upon completion of the 2012 Contract. The Government again intended it to be a sole source contract awarded to Northrop. In its Justification and Approval (J&A) request for proceeding without full and open competition, the Government explained that the AAQ-24 "is a major system with highly specialized firmware, hardware and software," and that the necessary "expertise, facilities, equipment, and repair data" to fulfill the contract was exclusive to Northrop.

23. The J&A also explained that none of the necessary information or technical expertise resided with the Government; Northrop had already developed experience in performing the repair work through the 2012 Contract; the Government had no reliable way of reverse engineering the necessary procedures; and Northrop had exclusive business arrangements with key suppliers and vendors that would undermine the Government's ability to do the repair work directly. Finally, the Government had assurances that the resulting contract would be fair and reasonable to the taxpayer because "[i]n accordance with FAR 15.403-4, the contractor will be required to provide certified cost or pricing data to be used in supporting the Government's evaluation of the proposed cost."

24. In November 2016, Northrop submitted its Contract Pricing Proposal in response to the 2016 RFP. In the Proposal, Northrop expressly noted that: "This proposal presents

certifiable cost or pricing data and a fully executed Contract Pricing Proposal Cover Sheet in conformance with FAR 15.403 Table 15-2. Northrop Grumman will provide updated certifiable data as requested and in support of negotiations and certification as applicable. A Certificate of Current Cost or Pricing Data will be provided at the conclusion of negotiations for contract award in accordance with FAR 15.406."

25. In its Proposal, Northrop failed to disclose the excess inventory accumulated during the 2012 Contract. Thus, it misled the Government into believing that it needed to purchase more inventory than necessary to fulfill its obligations under the new contract.

26. Northrop provided an executed Certificate of Current Cost or Pricing Data ahead of contract execution in December 2017. The Certificate stated that the "cost or pricing data [] submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative" in support of the Contract are "accurate, complete, and current..."

27. As outlined above, that certification was false, because Northrop failed to disclose the substantial excess inventory it purchased with 2012 Contract funds. Moreover, the failure to disclose this excess inventory likely led to additional data in the 2016 Cost Proposal to be false, for example, labor hours tied to procurement and repair of inventory. Thus, despite having certified that the cost and pricing data Northrop had submitted to the Air Force was current, accurate and complete, Northrop knew that that data was, in fact, not current, accurate or complete.

28. The Government agreed to contract rates on the basis of the false and misleading cost and pricing data from Northrop, and executed contract FA8522-18-D-0002 in December 2017, with a period of performance from December 2017 to December 2022 (the "2017 Contract"). The 2017 Contract followed the same basic payment structure as the 2012 Contract – Program Management Support payments totaling over $100 million plus payments upon delivery of repaired assets. The 2017 Contract also incorporated the same (or substantially similar) contract financing and government property clauses as in the 2012 Contract.

29.     The 2017 Contract was priced at $444 million, inclusive of an approximately 14% profit rate. But largely because it had concealed the substantial excess inventory previously purchased with Government funds – thus tricking the Government into paying for inventory Northrop did not need to buy – Northrop soon found itself enjoying a **56% profit** on the 2017 Contract, a margin unheard of in sole source, fixed-price contracts.

30.     An important metric here is the advanced cash position – *i.e.*, revenue above and beyond what Northrop was expecting even when accounting for the built-in profit margin. By the fourth quarter of 2018, less than one year into implementation of the 2017 Contract, the advanced cash position had spiked to over $60 million. In other words, in less than a year, Northrop had collected from the government its expected costs, a 14% profit, *plus* another approximately $60 million.

31.     In the coming months, the advanced cash position continued to grow, reaching approximately $63 million by the second quarter of 2019.

32.     When Relator and others at Northrop investigated, AAQ-24 program management staff cited "stock on hand" – the excess inventory Northrop purchased with the Government's 2012 Contract funds – as the primary reason for the advanced cash position. This was expressly stated by AAQ-24 program management staff at Northrop team meetings in late 2018 and 2019, was reflected in internal presentations, and was evident from Relator's direct review of AAQ-24 records in the third quarter of 2019. Relator's review was performed in substantial part at Northrop's Warner Robins site in Georgia, where much of the AAQ-24 repair work was centered.

33.     On multiple occasions, including at a meeting in September 2019, Relator voiced concern that the advanced cash position was the result of a TINA violation – the failure to disclose the excess inventory Northrop gained throughout the 2012 Contract. Senior Northrop employees, including the Division Director of Business Management, the Division Controller, and the CFO/VP, rejected Relator's complaints and concerns, and maintained that Northrop was rightfully benefitting from inventory purchased with Government funds, without further

explanation. Notably, the advanced cash position generated by the 2017 Contract boosted Division-wide profits, which in turn helped deliver bonuses to both the CFO/VP and the Division Director.

34. Based on her analysis throughout late 2018 and 2019, including the onsite visits, Relator expected, and on that basis alleges, that the advanced cash position continued to grow throughout 2019. Moreover, there is no reason to believe that growth will stop in the near future. This means that a mere two years into implementation of the 2017 Contract, Northrop has deceived the government into paying it $63 million (and likely more) *above* negotiated profits.

35. Throughout the course of her investigation, Relator learned of other substantial improprieties related to Northrop's 2016 Cost Proposal, which formed the basis of the 2017 Contract price. For example, in its 2016 Cost Proposal, Northrop based its costs on a representation to the Government that it would repair 100% of laser subcomponents. In fact, Northrop decided to repair the laser subcomponents at a far lower rate. In effect, Northrop is being paid as if it is repairing far more lasers than it actually is.

36. More generally, Northrop has unilaterally altered its execution approach to a wide range of assets. Whereas its Cost Proposal represented it would repair all failed assets, Northrop is instead leaving failed assets unrepaired based upon excess inventory levels. Thus, just as with the lasers, Northrop is being reimbursed for a degree of work it has decided not to perform, without the Government's knowledge or approval.

37. Likewise, in its 2016 Cost Proposal, Northrop based its costs on a representation to the Government that its purchasing activity in a given year would include preparatory work for the next year – a relatively common practice designed to ensure continuity throughout a multi-year contract. In fact, Northrop has declined to engage in that preparatory work. Once again, its contract rates are predicated on costs it represented to the Government but has unilaterally decided not to incur.

38. Further, the advanced cash position – resulting in an astonishing 56% profit margin – calls into question the accuracy of Northrop's estimating methodology for the 2017

Contract. Indeed, Northrop booked an approximately 23% profit for the 2012 Contract, and at minimum its experience in performing that contract should have led to fairly accurate estimates for the 2016 Cost Proposal. This conclusion is bolstered by the fact that Northrop was the designated expert on AAQ-24. The excess revenue under the 2017 Contract thus not only evidences the specific cost omissions and misrepresentations outlined above, but suggests a reckless disregard in preparing its Cost Proposal more broadly.

39. Through its omissions and misrepresentations, including failing to disclose the excess inventory and misrepresenting the costs it would incur with failed assets and advance purchases, Northrop knowingly deceived the government. Had the Air Force contracting officials known about the omitted and misrepresented facts, they would not have agreed to the final 2017 Contract price of $444 million.

40. Further, in failing to provide such information to the Air Force, Northrop knowingly violated the Truth in Negotiations Act, 10 U.S.C. § 2306a (1994), and applicable regulations, by failing to provide current, accurate and complete cost and pricing data to Air Force contract negotiators.

41. The 2012 and 2017 Contracts expressly incorporated 48 C.F.R. § 52.215-10, a government contracting clause titled "Price Reduction for Defective Certified Cost or Pricing Data." Under that clause, where a contract price was increased because of "certified cost or pricing data that were not complete, accurate, and current," or because of other inaccurate information, the government is entitled to a reduction in the contract price accordingly plus interest on the overpayment. It is also entitled to a penalty "equal to the amount of the overpayment" if the submission were knowingly "incomplete, inaccurate, or noncurrent." 48 C.F.R. § 52.215-10(a)(3), (d). Here, Northrop's certified cost or pricing data was knowingly "incomplete, inaccurate, or noncurrent," and it thus owes the Government the value of the unjustified increase in contract price, interest, and the designated penalty.

42. Northrop periodically submitted requests to the United States for substantial Program Management Support payments to support the work on the 2017 Contract. These claims

for payment were inflated by Northrop's failure to disclose current, accurate and complete cost and pricing data to the Air Force. Had the United States been aware of the false cost and pricing data, the United States would not have made those payments.

43. Northrop routinely submitted claims for payment to the United States upon delivering repaired AAQ-24 assets. These invoices were inflated by Northrop's misrepresentations to the Air Force of the costs of performing the 2017 Contract. The United States paid each invoice submitted to it, but had the United States been aware of Northrop's omissions and misrepresentations, the United States would not have made those payments.

## CAUSES OF ACTION

### COUNT I
### (False Claims Act, 31 U.S.C. § 3729, et seq.)
### (Against All Defendants)

44. Relator incorporates the preceding paragraphs of the Complaint as though fully set forth herein.

45. This is a civil action brought by Relator, on behalf of the United States of America, for treble damages and penalties against Defendants under the False Claims Act, 31 U.S.C. § 3730(b)(1).

46. Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

47. Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records and/or statements to get false or fraudulent claims to the United States paid, in violation of 31 U.S.C. § 3729(a)(1)(B).

48.     Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

49.     Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

50.     The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid but for Defendants' fraudulent scheme.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests judgment against Defendants as follows:

A.      That Defendants be ordered to cease and desist from submitting any more false claims, or further violating the FCA;

B.      That judgment be entered in the United States of America's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a)(1); a civil penalty of not less $5,500 or more than $11,000 per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990; and damages as set out in 10 U.S.C. § 2306a and 48 C.F.R. § 52.215-10.

C.      That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

D.      That Relator be awarded a share of the judgment as set forth in 31 U.S.C. § 3730(d);

E. That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Relators in the prosecution of this suit; and

F. That Relators be granted such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

Dated: February 13, 2020

Respectfully submitted,

By: _____
Mikhael D. Charnoff

Mikhael D. Charnoff, VSB No. 43929
Eduardo Morales Rios, VSB No. 92051
PERRY CHARNOFF PLLC
1010 N. Glebe Road, Suite 310
Arlington, VA 22201
Tel: 703-291-6650
Fax: 703-563-6692
mike@perrycharnoff.com
eduardo@perrycharnoff.com

Robert J. Nelson
rnelson@lchb.com
Nimish R. Desai
ndesai@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008

*Attorneys for Relator*